UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. INVENTOR, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> U.S. PATENT AND TRADEMARK OFFICE, <br><br> *Defendant*. | Civil Action No. 21-2893 (TSC) |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

BACKGROUND ........................................................................................................ 1

    A.    *Inter Partes* Review ............................................................................ 1

    B.    U.S. Inventor's Records Requests ...................................................... 3

LEGAL STANDARD ............................................................................................... 3

ARGUMENT ............................................................................................................ 4

I.    The Agency Conducted an Adequate Search for Responsive Records ............................ 4

II.    The Agency Properly Withheld Exempt Information ........................................................ 6

    A.    The Agency Properly Withheld Information Under Exemption 5 Based on the Deliberative Process Privilege ................................................... 7

        1.    The Agency properly withheld communications between panel members and Agency leadership and/or management ............................................. 12

            a.    Communications between panel members and Agency leadership and management are not impermissible ex parte contacts ........... 12

            b.    The communications at issue are within the scope of panel decision-making .............................................................. 15

        2.    The Agency properly redacted an email from a patent owner's attorney . 16

        3.    The Agency properly withheld email subject lines that reveal panel judges' deliberations over cases before them .......................................... 17

        4.    The Agency did not withhold policy determinations ................................ 18

    B.    The Agency Properly Withheld Exempt Information Under Exemption 5 Based on the Attorney-Client Privilege ............................................. 18

    C.    The Agency Properly Withheld Exempt Information Under Exemption 5 Based on the Work Product Doctrine ............................................... 20

    D.    The Agency Properly Withheld Exempt Information Under Exemption 6 ......... 21

III.    The Agency Produced All Non-Exempt, Reasonably Segregable Portions of Records... 24

CONCLUSION ......................................................................................................... 25

Defendant U.S. Patent and Trademark Office ("the Agency"), by and through undersigned counsel, respectfully files this memorandum of points and authorities in support of its cross-motion for summary judgment, and in opposition to Plaintiff U.S. Inventor, Inc.'s motion for summary judgment, ECF No. 16. As explained below, the Agency conducted an adequate search for records responsive to U.S. Inventor's request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, properly withheld under Exemptions 5 and 6 certain information the release of which foreseeably would harm interests that those exemptions protect, and produced all non-exempt, reasonably segregable portions of such records.

## BACKGROUND

### A.    *Inter Partes* Review

The Agency is "responsible for the granting and issuing of patents." 35 U.S.C. § 2(a)(1). The Patent Trial and Appeal Board ("Board") is an office within the Agency that "decides whether an invention satisfies the standards for patentability on review of decisions by primary examiners." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1977 (2021); 35 U.S.C. § 6(a). The Board hears cases in panels of at least three members drawn from the Agency's Director, Deputy Director, Commissioner for Patents, and Administrative Patent Judges ("Patent Judges").  35 U.S.C. § 6(c).

The Board can reexamine an issued patent in several ways. *See Arthrex*, 141 S. Ct. at 1977; 35 U.S.C. § 6(b)(2)-(4). "One such procedure is *inter partes* review," which "is an adversarial process by which members of the [Board] reconsider whether existing patents satisfy the novelty and nonobviousness requirements for inventions." *Arthrex*, 141 S. Ct. at 1977; 35 U.S.C. § 311(a). "Any person—other than the patent owner himself—can file a petition to institute *inter partes* review of a patent." *Arthrex*, 141 S. Ct. at 1977; 35 U.S.C. § 311(a). An *inter partes* proceeding "resembles civil litigation in many respects." *Arthrex*, 141 S. Ct. at 1977. *Inter partes* review panels "typically" consist of three Patent Judges. *Id.* A dissatisfied party may seek judicial review

in the U.S. Court of Appeals for the Federal Circuit. 35 U.S.C. § 319. The Director may intervene before the Federal Circuit to represent the Agency's position. *Id.* § 143. Once judicial proceedings terminate or the time to seek judicial review expires, "the Director shall issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent by operation of the certificate any new or amended claim determined to be patentable." *Id.* § 318(b).

In recent years, both the Board and Federal Circuit have repeatedly confronted the question of whether and to what extent sovereign immunity shields patent holders from *inter partes* review challenges. In December 2017, the Board held that state sovereign immunity applies in *inter partes* review proceedings, but concluded that the patent owner at issue had waived such immunity. *See LSI Corp. v. Regents of the Univ. of Minn.*, No. IPR2017-01068, 2017 WL 6517562, at *1 (P.T.A.B. Dec. 19, 2017); *Ericsson Inc. v. Regents of Univ. of Minn.*, Patent No. RE45,230 E, 2017 WL 6517563, at *1 (P.T.A.B. Dec. 19, 2017). Several months later, however, in February 2018, the Board concluded that tribal sovereign immunity does not apply in *inter partes* review proceedings, distinguishing its precedent regarding state sovereign immunity. *See Mylan Pharms. Inc. v. Saint Regis Mohawk Tribe*, No. 8,629,111 B2, 2018 WL 1100950, at *4 & n.4 (P.T.A.B. Feb. 23, 2018). Later that year, the Federal Circuit affirmed the Board on the issue of tribal sovereign immunity, concluding that such immunity does not apply in *inter partes* review proceedings. *See Saint Regis Mohawk Tribe v. Mylan Pharms. Inc.*, 896 F.3d 1322, 1326 (Fed. Cir. 2018). A year later, the Federal Circuit reversed the Board on the issue of state sovereign immunity, concluding that such immunity likewise does not apply in *inter partes* review proceedings. *See Regents of the Univ. of Minn. v. LSI Corp.*, 926 F.3d 1327, 1330 (Fed. Cir. 2019).

2

### B.     U.S. Inventor's Records Requests

On April 19, 2021, U.S. Inventor filed a FOIA request for certain records regarding the *inter partes* review proceedings that had involved the issue of tribal sovereign immunity. Compl. ¶ 16. Specifically, U.S. Inventor sought "records regarding the makeup of the panels for the [ ] proceedings, records related to the dates judges were added to the panels, records of *ex parte* input into the makeup of the panels, related communications, records of assignments to the proceedings, and records of policy determinations relating to sovereign immunity." *Id.* The Agency designated this request as FOIA Request F-21-00100. *Id.* ¶ 17. On April 20, 2021, U.S. Inventor filed a second FOIA request, this one for certain records regarding the *inter partes* review proceedings that had involved the issue of state sovereign immunity. *Id.* ¶ 24. Specifically, U.S. Inventor sought "records regarding the expansion of the panel in [one of the proceedings], application of sovereign immunity, ex parte communications, and any outside sourcing of opinions." *Id.* The Agency designated this request as FOIA Request F-21-00102. *Id.* ¶ 25.

On November 2, 2021, U.S. Inventor filed suit. *See* Compl. Over the next year and a half, the Agency made a series of productions, with certain redactions under Exemption 5, based on the deliberative process privilege, attorney-client privilege, and work-product doctrine, as well as under Exemption 6. *See* Ex. K, Decl. of Kathryn Siehndel ¶¶ 23-36; Ex. J, *Vaughn* Indices.

### LEGAL STANDARD

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "FOIA cases are typically and appropriately decided on motions for summary judgment." *Benjamin v. Dep't of State*, 178 F. Supp. 3d 1, 3 (D.D.C. 2016), *aff'd*, No. 16-5175 2017 WL 160801 (D.C. Cir. Jan. 3, 2017) (internal quotation marks omitted). An agency is entitled to summary judgment in a FOIA case if it shows that no material facts are disputed, it conducted an adequate search for responsive records, and

each responsive record has been produced or is exempt from disclosure. *Weisberg v. Dep't of Just.*, 627 F.2d 365, 368 (D.C. Cir. 1980). An agency may rely on reasonably detailed, non-conclusory declarations to meet this burden. *See McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983).

## ARGUMENT

The Agency conducted an adequate search for responsive records, and produced 493 pages of responsive records. Siehndel Decl. ¶ 55. It properly withheld certain material under Exemption 5 based on the deliberative-process privilege, attorney-client privilege, and work-product doctrine, as well as Exemption 6, the release of which foreseeably would harm interests these Exemptions protect. And it produced all reasonably segregable, non-exempt information. As such, this Court should enter judgment for the Agency, and deny U.S. Inventor's motion for summary judgment.

## I.     The Agency Conducted an Adequate Search for Responsive Records

The Agency conducted an adequate search for records responsive to U.S. Inventor's FOIA requests. "[A]n adequate search entails a showing that the agency made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Montgomery v. IRS*, 40 F.4th 702, 714 (D.C. Cir. 2022) (cleaned up). "A search need not be perfect, only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request." *DiBacco v. Army*, 795 F.3d 178, 194-95 (D.C. Cir. 2015) (cleaned up). In other words, "the adequacy of a search is determined not by the fruits of the search, but by the appropriateness of its methods." *Hodge v. FBI*, 703 F.3d 575, 579 (D.C. Cir. 2013) (cleaned up). A search is not inadequate merely because it fails to "uncove[r] every document extant." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).

An agency can demonstrate the adequacy of its search through a declaration explaining the search performed, and averring that all files likely to contain responsive materials were searched. *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 313-14 (D.C. Cir. 2003). Such declarations

"are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs.*, 926 F.2d at 1200 (quotation marks omitted). "[I]f an agency demonstrates that it has conducted a reasonably thorough search, the FOIA requester can rebut the agency's affidavit only by showing that the agency's search was not made in good faith." *Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir. 1993). Speculative or hypothetical assertions are insufficient to raise a material question of fact as to the search's adequacy. *Oglesby v. Dep't of Army*, 920 F.2d 57, 67 n.13 (D.C. Cir. 1990).

In searching for responsive records, the Agency reviewed the files relating to each of the 20 separate cases that U.S. Inventor's requests had identified. Siehndel Decl. ¶ 56. The Agency also collected records from all of the custodians whom U.S. Inventor's requests identified, except for a single former Patent Judge who no longer works at the Agency, over whom the Agency no longer had control. *Id.*; *see also Leopold v. CIA*, 177 F. Supp. 3d 479, 495 (D.D.C. 2016) (agency "did precisely what a responsible agency should do when faced with this type of FOIA request, which is to first consult with Agency officials knowledgeable about the subject matter to ascertain the universe of responsive records and to identify the specific offices and individuals who would possess those documents." (cleaned up)). The Agency then reached back out to the custodians identified in the first request to ensure that it had not overlooked any responsive records, locating four additional records, amounting to 41 pages in total. Siehndel Decl. ¶ 56.

Finally, as explained in the attached declaration, the Agency located data identifying the dates that it had assigned panel members to the 20 cases at issue in the first request, and explained in detail why such records do not exist for the second request. *Id.* ¶ 57. As such, this aspect of U.S. Inventor's motion, Pl.'s Mot. at 15-16, is moot. *Sales v. Dep't of Air Force*, 684 F.3d 160, 164

5

(D.C. Cir. 2012) ("the release of requested documents to a plaintiff renders its FOIA suit moot with respect to those documents" (internal quotation marks omitted)).

In light of the above, U.S. Inventor cannot show that the Agency's "search was not made in good faith." *Maynard*, 986 F.2d at 560. As such, the Agency conducted an adequate search for responsive records, and so is entitled to summary judgment as to the adequacy of its search.

## II.      The Agency Properly Withheld Exempt Information

Exemption 5 shields "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested." 5 U.S.C. § 552(b)(5). Exemption 5 thus "covers records that would be normally privileged in the civil discovery context." *Nat'l Ass'n of Crim. Def. Lawyers v. Exec. Off. for U.S. Att'ys*, 844 F.3d 246, 250 (D.C. Cir. 2016) (internal quotation marks omitted). Exemption 6, meanwhile, shields "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The Court must give FOIA's exemptions "a fair reading" rather than a narrow one, because these exemptions serve "important interests" and "are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (cleaned up). If information falls within one of FOIA's exemptions, an agency can withhold that information if it "reasonably foresees that disclosure would harm an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I).[1]

---

[1]      An agency may also withhold records where disclosure is prohibited by law regardless of whether it can satisfy the foreseeable harm standard, 5 U.S.C. § 552(a)(8)(A)(i)(II), but the Agency does not contend that any of the records at issue fall within this category.

An agency bears the burden to show that a record falls within an exemption's scope. *Petro. Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992). The agency "can meet this burden through affidavits or declarations that describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *People for the Ethical Treatment of Animals v. Dep't of Health & Human Servs.*, 901 F.3d 343, 349 (D.C. Cir. 2018) (internal quotation marks omitted).  As explained below and in the attached *Vaughn* indices, the Agency properly withheld information under Exemption 5, based on the deliberative process privilege, attorney-client privilege, and work product doctrine, and Exemption 6, the release of which foreseeably would harm interests these exemptions protect. As such, the Agency is entitled to summary judgment as to its withholdings.

### A. The Agency Properly Withheld Information Under Exemption 5 Based on the Deliberative Process Privilege

Exemption 5 shields from disclosure records that are subject to the deliberative process privilege—those "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 357 (D.C. Cir. 2021) (quotation marks omitted). To fall within the deliberative process's scope, a record must be "both predecisional and deliberative." *Id.* at 362. A record "is predecisional if it was generated before the agency's final decision on the matter," and "is deliberative when it is prepared to help the agency formulate its position, and it reflects the give-and-take of the consultative process." *Id.* (cleaned up). "There is considerable overlap between these two prongs because a document cannot be deliberative unless it is predecisional." *Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021).

The Agency properly relied on the deliberative process privilege to withhold records concerning *inter partes* review panel members' deliberations over the cases pending before them. The withheld records consist of draft decisions circulated among panel members for comment, summaries and notes that panel members shared with each other, emails between panel members, and other documents that reflect panel members' thought processes regarding cases before them. Siehndel Decl. ¶ 61.[2] Most of these records reflect discussions specific to particular cases before particular panels, while some reflect discussion of issues of general applicability across cases. *Id.*

Producing these materials would reveal panel members' internal deliberations about cases before them. Siehndel Decl. ¶ 61. Such information falls squarely within the deliberative process privilege's scope. It was "generated before [panel members'] final decision on the" cases before them, was "prepared to help [panel members] formulate" their decisions, and "reflects the give-and-take of the consultative process," *Reps. Comm.*, 3 F.4th at 362, in that it reveals panel members' deliberations over the cases before them prior to issuing their decisions. Siehndel Decl. ¶ 61; *see Sierra Club, Inc.*, 141 S. Ct. at 786 ("The deliberative process privilege protects the draft biological opinions at issue here because they reflect a preliminary view—not a final decision—about the likely effect of the EPA's proposed rule on endangered species.").

Releasing this information foreseeably would harm interests that the deliberative process privilege protects, in two separate ways. Siehndel Decl. ¶¶ 62-63. First, disclosure "would create confusion to the extent that these deliberations reflect considerations other than those reflected in the [panel's] final decisions." *Id.* ¶ 62. Panel members "are charged with making decisions about individual property rights, which are heavily litigated matters," and their "conclusions have critical

---

[2]    The Agency previously withheld additional materials under the deliberative process privilege, but has since produced that information. Siehndel Decl. ¶ 60.

commercial and financial impacts on patent owners, the third parties who petition for [*inter partes*] proceedings (i.e., non-patent owners), and on future unknown parties to private infringement litigation." *Id.* "Disclosing the judges' opinions and thought processes entertained in advance of final decisions—even after the final decision is rendered—would impact parties for many years to come," by creating confusion as to the grounds for panel decisions. *Id.*

For example, Patent Judges "make initial patentability determinations, which includes evaluation of individual patent 'claims,'" i.e., "the sections of a patent that tell third parties what they can and cannot do." Siehndel Decl. ¶ 62. "Infringement cases frequently call for evaluation of the scope of the patent and interpretation of the individual patent claims." *Id.* If a Patent Judge "shares an opinion or edits a decision on the scope of a claim, and that pre-decisional opinion is disclosed, it would no doubt be harmful if a party tried to use those deliberative thoughts as persuasive evidence when the scope is called into question in future litigation." *Id.*; *see also Campaign Legal Ctr. v. Dep't of Just.*, 34 F.4th 14, 23 (D.C. Cir. 2022) (privilege "protects the public from being misled by documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action" (internal quotation marks omitted)); *Reps. Comm.*, 3 F.4th at 361 (privilege "guards against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action" (internal quotation marks omitted)); *Petro. Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1437 n.10 (D.C. Cir. 1992) ("a subsidiary rationale" for the privilege is the "risk of public confusion").

Second, disclosure would also "have a chilling effect on open communications among the [Patent Judges themselves], which would in turn have a negative impact on their decision-making process." Siehndel Decl. ¶ 63. "Like any adjudicative body, [the Board] engenders passionate

feelings from the public and is no stranger to media attention." *Id.* "[T]o ensure consistency and fairness in decision-making," it is "vital" for panel members "to be able to consult their leadership and one another on matters of policy, law, and subject matter expertise." If panel members "live in fear that their internal communications and draft decisions will be the subject of disclosure and media fodder (much of which results in incorrect speculation), it would critically disincentivize the discussions that improve the quality of their decisions." *Id.*; *see also Reps. Comm.*, 3 F.4th at 372 ("the sensitivity of the context in which these conversations arose as well as their subject matter, and the need for confidentiality in [the] discussions . . . together provide the particularized context for a finding of foreseeable harm"); *Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1125 (D.C. Cir. 1989) (disclosure would chill "the candor of potential reviewers of government-submitted articles" and thus "result in the publication of inferior work"); *Jud. Watch, Inc. v. Dep't of Just.*, Civ. A. No. 19-0800 (TSC), 2023 WL 3055426, at *3 (D.D.C. Apr. 24, 2023) ("The discussion in those edits is substantive, with significant debate between the officials that drafted and reviewed it . . . . The declaration also situates the exchange of that information within the [agency's deliberative] process" (internal quotation marks omitted)).

These concerns go to the privilege's core, furnishing "reasons to foresee that" disclosure's "chilling effect [is] highly likely." *Jud. Watch*, 2023 WL 3055426, at *4; *see also Reps. Comm.*, 3 F.4th at 361-62 (privilege "assures agency staff that they can provide their candid opinions and recommendations to decisionmakers without fear of ridicule or reprisal" and "reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options" and "an understanding that employees would be chilled from such rigorous deliberation if they feared it might become public"); *Machado Amadis v. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) ("those who expect public dissemination of

their remarks may well temper candor with a concern for appearances to the detriment of the decisionmaking process" (internal quotation marks omitted)); *Sierra Club*, 141 S. Ct. at 785 (privilege "protect[s] agencies from being forced to operate in a fishbowl).

The Agency thus meets the foreseeable harm standard as to the records withheld under the deliberative process privilege. It "articulat[ed] the connection between the information at issue— along with its place in the particular processes involved—and the chilling effect of disclosure *Judicial Watch*, 2023 WL 3055426, at *3. *Machado Amadis* is instructive—there, the agency met the foreseeable harm standard where its "affidavit adequately explained that full disclosure of the [records] would discourage line attorneys from candidly discuss[ing] their ideas, strategies, and recommendations, thus impairing the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals," because "[s]uch chilling of candid advice is exactly what the privilege seeks to prevent." 971 F.3d at 371 (cleaned up). The D.C. Circuit recognized that the agency had not "simply rel[ied] on generalized assertions that disclosure 'could' chill deliberations," because it had (1) "specifically focused on the information at issue" in identifying the precise records that it withheld, and (2) explained "that disclosure of that information 'would' chill future internal discussions," not that it simply "could" chill such deliberations. *Id.* Here, too, the Agency identified specific categories of information withheld under the deliberative process privilege, and explained with particularity how disclosure of that information "would" chill intra-agency deliberations. Siehndel Decl. ¶¶ 62-63. These explanations "are at least as detailed as those in *Machado Amadis*." *Jud. Watch*, 023 WL 3055426, at *3 (internal quotation marks omitted).

U.S. Inventor challenges the Agency's reliance on the deliberative process privilege as to four specific categories of information: (1) communications between panel members and agency leadership and/or management, (2) an email from a patent owner's attorney to the Agency,

(3) certain email subject lines, and (4) Agency policy determinations. But as explained further below, the Agency properly invoked the privilege to withhold materials in the first three categories, and did not withhold any materials in the fourth category.

> 1. The Agency properly withheld communications between panel members and Agency leadership and/or management

The Agency properly invoked the privilege to withhold records reflecting communications between panel members and Agency leadership and/or management about legal and/or policy issues across cases. The communications that these records reflect are not impermissible ex parte communications, and fall within the scope of panel decision-making.

> a. Communications between panel members and Agency leadership and management are not impermissible ex parte contacts

U.S. Inventor's contention that the privilege does not cover communications between panel members and Agency leadership and/or management, *see* Pl.'s Mot. at 17-23, is meritless. The communications at issue involve only "legal and policy issues across cases," not "new factual information about specific" *inter partes* review proceedings. Siehndel Decl. ¶ 67. Nothing in the Constitution, the Administrative Procedure Act ("APA"), or governing regulations prohibits such communications. *See In re Gould*, 673 F.2d 1385, 1386-87 (C.C.P.A. 1982) ("the solicitor in an ex parte patent appeal . . . is not an adverse party. He is legal counsel to the [Agency], and charged with defending its decision. It is not improper for him to discuss a case at any stage with the Commissioner, the board, or an examiner . . . . Such discussion is neither impermissible 'tampering,' nor impermissible ex parte contact.").

First, due process principles do not prohibit the communications at issue. *Stone v. FDIC*, 179 F.3d 1368, 1376 (Fed. Cir. 1999), in which the Federal Circuit concluded that due process principles prohibit a deciding official from receiving "additional material information that may undermine the objectivity required to protect the fairness of the process," is inapposite. The D.C.

Circuit has held that *Stone* "is confined . . . to instances where the decider received 'new and material' information," and does not apply where "there is no claim, or any reason to suspect," that "the decider received 'new and material' information. *Sw. Airlines Co. v. TSA*, 554 F.3d 1065, 1074 (D.C. Cir. 2009) (quoting *Stone*, 179 F.3d at 1374-75). Thus, intra-agency communications that contain only legal and/or policy analysis, not any new case-specific facts, are not unlawful. *See Kuretski v. Comm'r*, 755 F.3d 929, 945 (D.C. Cir. 2014) ("there is no basis for recognizing a constitutional entitlement for taxpayers to comment on an IRS settlement officer's report to her appeals team manager or present their case directly to the appeals team manager"); *Gottlieb v. Pena*, 41 F.3d 730, 737 (D.C. Cir. 1994) (an agency need not "disclose [its] initial recommended decision and . . . allow comment on it," as plaintiff "cannot force the agency to open its essentially deliberative process"); *Sw. Airlines*, 554 F.3d at 1075 (characterizing *Gottlieb* as upholding "against due process challenge an adjudicative procedure allowing staff to communicate *ex parte* with the ultimate decisionmaker"); *see also Garza v. Dep't of Just.*, 5 F. App'x 894, 896 (Fed. Cir. 2001) (agency need not disclose report reflecting "review of the arguments [plaintiff] made in challenging proposed removal," not "evidence upon which the agency proposed to remove" him).

Second, the APA does not prohibit the communications at issue, either. The APA prohibits panel members from "consult[ing] a person or party on a fact in issue, unless on notice and opportunity for all parties to participate." 5 U.S.C. § 554(d)(1). But the APA defines the term "person" to exclude "an agency," *id.* § 551(2), and regardless, the communications at issue do not involve "fact[s] in issue," 5 U.S.C. § 554(d)(1), as they relate only to legal and policy issues across cases, Siehndel Decl. ¶ 67. U.S. Inventor's reliance on *Butz v. Economou*, 438 U.S. 478 (1978), is misplaced. Citing Section § 554(d)(1), *Butz* said that a hearing officer may not "consult any person or party, including other agency officials, concerning a fact at issue in the hearing, unless on notice

and opportunity for all parties to participate." 438 U.S. at 514. But this language most naturally is read in harmony with Section 551(2) to refer only to personnel who cannot be said to speak for the agency. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979) ("the language of an opinion is not always to be parsed as though we were dealing with language of a statute"). *Butz* did not consider Section 551(2), or decide whether it exempts agencies from Section 554(d)(1). *See Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022) ("respect for past judgments also means respecting their limits"); *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents"); *UC Health v. NLRB*, 803 F.3d 669, 682 (D.C. Cir. 2015) ("if an issue is not argued, or though argued is ignored by the court, or is reserved, the decision does not constitute a precedent to be followed with respect to that issue" (cleaned up)).

The APA also provides that "[a]n employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision." 5 U.S.C. § 554(d)(2)(C). But this provision "does not apply . . . to the agency," either. *Id.* Regardless, U.S. Inventor alleges that panel members are being pressured by Board "management," "directors," and "other judges," Pl.'s Mot. at 18, who do not perform "investigative or prosecuting functions," 5 U.S.C. § 552(d)(2)(C), and thus are not within this provision's scope. Indeed, the agency does not investigate or prosecute *inter partes* review proceedings—it only adjudicates them. *See* 35 U.S.C. §§ 311-319; *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1371 (2018). Finally, the APA's bar on communications between administrative law judges and "interested person[s] outside the agency," 5 U.S.C. § 557(d)(1)(A)-(B), does not apply to intra-agency communications.

Third, 37 C.F.R. § 42.5(d), which provides that "[c]ommunication regarding a specific proceeding with a Board member . . . is not permitted unless both parties have an opportunity to be involved in the communication," likewise is inapposite. This provision applies only to those communications that concern "a specific proceeding," and, as explained, the records at issue reflect only communications concerning legal and policy issues that cut across cases. *See* Siehndel Decl. ¶ 67. The Agency's practice guide for Board proceedings reinforces this conclusion, explaining that Section 42.5(d) "does not extend to" a "reference to a pending case in support of a general proposition," such as "to illustrate a systemic problem." *Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,758 (Aug. 14, 2012); *see also* Sierra B. Weingartner, *Return to Sender: A Case for Allowing Federal Agencies to Initiate Post-Grant Review Proceedings*, 22 Wake Forest J. Bus. & Intell. Prop. L. 283, 303 n.165 (2022) (Section 42.5(b) prohibits communications with "interested outside parties"); Christopher J. Walker & Melissa F. Wasserman, *The New World of Agency Adjudication*, 107 Cal. L. Rev. 141, 163 n.131 (2019) (Section 42.5(d) "prohibit[s] ex parte communications" in a manner "[l]ike the APA's formal adjudication provisions").

For all of these reasons, the communications at issue do not constitute impermissible ex parte communications, and thus fall within the deliberative process privilege's scope.

> b.    *The communications at issue are within the scope of panel decision-making*

The communications at issue also fall within the scope of proper panel decision-making. Communications between panel members and Agency leadership and/or management about legal and policy issues are an ordinary and proper aspect of panel decision-making. *See* Siehndel Decl. ¶ 68 (panel members are not "forbidden from seeking guidance or coordination within" Agency); *Gould*, 673 F.2d 1385 (Patent Judges can discuss cases with Agency lawyer); Gov't Accountability Off., GAO-23-105336, *Patent Trial and Appeal Board: Increased Transparency Needed in*

*Oversight of Judicial Decision-Making* ("*Report*") 41-42 (Dec. 2022) (Board leaders and Agency Director properly "review[ ] the draft decisions and provides comments," set "expectations," offer "communication of a desired change or action," and provide "feedback on [panel] decisions").[3]

### 2. The Agency properly redacted an email from a patent owner's attorney

U.S. Inventor's challenge to the Agency's redaction of portions of an August 11, 2017, email from a patent owner's attorney to the Agency, *see* Pl.'s Mot. at 23-24, is equally meritless. A Patent Judge highlighted certain portions of the email following a discussion with other panel members hearing the case, then forwarded the email to those panel members. Siehndel Decl. ¶ 70. These materials fall within the privilege's scope because they reveal panel members' thought processes regarding pending cases and specific points of interest to the panel, shedding light on panel deliberations. *Id.*; *see also Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 886 (D.C. Cir. 2021) ("The deliberative process . . . covers records documenting the decisionmaking of executive officials generally."); *Pub. Emps. For Env't Resp. v. EPA*, Civ. A. No. 18-2219 (BAH), 2021 WL 2515007, at *9 (D.D.C. June 18, 2021) ("redlines" and "comment bubbles" fell within privilege's scope); *Ctr. for Medicare Advoc., Inc. v. Dep't of Health & Hum. Servs.*, 577 F. Supp. 2d 221, 236 (D.D.C. 2008) ("mark-ups" were privileged).

The highlighted portions of the email, meanwhile, reflect the Patent Judge's deliberative assessment of the relative significance to the panel's deliberations of different portions of the email. Siehndel Decl. ¶ 70. Revealing this information would disclose the Patent Judge's thought processes and shed light on the panel's deliberations regarding the case. *See id.*; *Waterman v. IRS*,

---

[3]       U.S. Inventor mischaracterizes the report, suggesting that the report concluded that Agency and Board leadership and management should not offer input in Board cases. To the contrary, as explained above, the report recognized that Agency and Board leadership appropriately offer input in Board cases, recommending only that the Agency formalize its policies to improve transparency with respect to such input. *See Report*, *supra*, at 41-42.

61 F.4th 152, 159 (D.C. Cir. 2023) ("the deliberative process privilege protects documents reflecting agency officials' selection and organization of facts to help the agency formulate its position . . . . [such as] an evaluation of the relative significance of the facts recited in the record" that requires "exercise [of] some kind of judgment" (cleaned up)); *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (the privilege protects records reflecting "selection or organization of facts [that] is part of an agency's deliberative process"); *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1538 (D.C. Cir. 1993) ("The staff was to cull the relevant documents, extract pertinent facts, organize them to suit a specific purpose, and to identify the significant issues they encountered along the way."); *Pub. Emps.*, 2021 WL 2515007, at *17 ("the entire [document,] not just the redline edits and comment bubbles, is protected by the deliberative process privilege, because the entire document reflects agency judgment, deliberation, and decisionmaking with respect to which facts and studies to feature in the [ ] assessment.").[4]

### 3. The Agency properly withheld email subject lines that reveal panel judges' deliberations over cases before them

U.S. Inventor's challenge to the Agency's withholding of "factual information," Pl.'s Mot. at 25-26, fails as well. The Agency properly invoked the privilege to withhold certain email subject lines. These subject lines reveal the contents of panel deliberations over specific cases, Siehndel Decl. ¶ 75, and so fall within the privilege's scope. *See Pub. Citizen, Inc. v. Dep't of Educ.*, 388 F. Supp. 3d 29, 42 (D.D.C. 2019) ("the email's subject line is sufficiently detailed that its disclosure would reveal" privileged information); *Khatchadourian v. Def. Intel. Agency*, 597 F. Supp. 3d 96, 111 (D.D.C. 2022) (email subject lines contained exempt material); *In re App. of Chevron Corp.*,

---

[4]     U.S. Inventor's challenge to the withholding of two other emails from patent owners' attorneys to the Agency is moot, as the Agency has now released unredacted versions of those records. *See* Siehndel Decl. ¶¶ 71-72; *Sales*, 684 F.3d at 164.

Misc. No. 10-0371 (CKK), 2013 WL 11241413, at *7 (D.D.C. Apr. 22, 2013) (same). The Agency

has unredacted and produced all of the remaining "factual" material. Siehndel Decl. ¶¶ 73-76.

4.    <u>The Agency did not withhold policy determinations</u>

The Agency agrees with U.S. Inventor that the deliberative process privilege does not

protect policy determinations. *See* Pl.'s Mem. at 26-27. The Agency did not, however, withhold

any policy determinations. Siehndel Decl. ¶ 35. U.S. Inventor does not assert otherwise, arguing

only that "[t]o the extent that" exempt records reflect policy determinations, the Agency cannot

withhold them under the privilege, "if such documents exist." Pl.'s Mem. at 26-27. The Agency

confirms that it withheld no such information. Siehndel Decl. ¶ 35.

**B.    The Agency Properly Withheld Exempt Information Under Exemption 5 Based on the Attorney-Client Privilege**

Exemption 5 also "encompasses . . . the attorney-client privilege." *Nat'l Sec. Archive v.*

*CIA*, 752 F.3d 460, 462 (D.C. Cir. 2014). "The attorney-client privilege protects confidential

communications made between clients and their attorneys when the communications are for the

purpose of securing legal advice or services." *In re Lindsey*, 158 F.3d 1263, 1267 (D.C. Cir. 1998).

"The privilege promotes sound legal advocacy by ensuring that [an attorney] knows all the

information necessary to represent his client." *United States v. Philip Morris, Inc.*, 314 F.3d 612,

618 (D.C. Cir. 2003), *abrogated in unrelated part by Mohawk Indus., Inc. v. Carpenter*, 558 U.S.

100 (2009). It "encourage[s] full and frank communications between attorneys and their clients

and thereby promote[s] broader public interest in observance of law and administration of justice."

*Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981). The privilege covers not only "the giving

of professional advice to those who can act on it but also the giving of information to the lawyer

to enable him to give sound and informed advice." *Id.* at 390. The Agency properly relied on the

attorney-client privilege to withhold records reflecting confidential communications between

18

Agency officials and attorneys in the Agency's Office of the Solicitor made for the purpose of soliciting or providing legal advice regarding expected litigation. Siehndel Decl. ¶ 78. Such information falls well within the attorney-client privilege's scope. *See Lindsey*, 158 F.3d at 1267.

Releasing this material foreseeably would also harm interests the attorney-client privilege protects. "To provide effective representation, attorneys need full and frank disclosures from their clients." *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997) (internal quotation marks omitted). "Clients, it has been thought, might not be forthright if their lawyers could be turned into witnesses against them or if they could be forced to disclose their conversations with their lawyers." *Id.* Thus, "the general injury caused by the breach of the attorney-client privilege . . . is clear enough." *Philip Morris Inc.*, 314 F.3d at 622. Unsurprisingly, every judge in this District to consider the question has recognized in the attorney-client privilege context that an agency need not show much beyond disclosure itself to demonstrate foreseeable harm. *See, e.g.*, *Avila v. Dep't of State*, Civ. A. No. 17-2685 (RC), 2022 WL 2104483, at *12 (D.D.C. June 10, 2022) (breach of attorney-client privilege "would jeopardize agency officials' ability to freely give and receive legal advice in its operations"); *Cayuga Nation v. Dep't of Interior*, Civ. A. No. 20-2642 (ABJ), 2022 WL 888178, at *9 (D.D.C. Mar. 25, 2022) ("disclosure of privileged information is a harm in and of itself when it comes to the attorney-client relationship"); *Ecological Rts. Found. v. EPA*, Civ. A. No. 19-0980 (BAH), 2021 WL 535725, at *32 (D.D.C. Feb. 13, 2021) ("When invoking the attorney-client privilege, [ ] an agency likely does not need to reach far beyond the fact of disclosure to show foreseeable harm," because "disclosure of privileged information is a harm in and of itself"); *Reps. Comm. for Freedom of Press v. Customs & Border Prot.*, 567 F. Supp. 3d 97, 120 (D.D.C. 2021) ("the risk of harm through disclosure is more self-evident and the potential for agency overuse is attenuated"); *Tobias v. Dep't of Interior*, Civ. A. No. 18-1368 (CJN), 2021 WL 4262488, at *2

(D.D.C. Sept. 20, 2021) (breach of attorney-client privilege "would impair the ability of agency employees to fully inform agency counsel when seeking legal advice, resulting in unsound legal advice and advocacy on behalf of the agency" (cleaned up)).

The Agency has met its burden to show foreseeable harm here. Producing the records at issue "would undermine the confidence and ability of agency employees to enjoy the full and frank communication with their counsel that enables effective representation." Siehndel Decl. ¶ 79. "[D]isclosing communications about specific [Board] cases" also "would unfairly impact parties in future litigation." *Id.* "To disclose legal advice and client thoughts on these cases would lead to confusion and perhaps unfair assumptions in future litigation about the patents at issue." *Id.*

### C. The Agency Properly Withheld Exempt Information Under Exemption 5 Based on the Work Product Doctrine

"[M]aterials prepared by one's attorney in anticipation of litigation are generally privileged from discovery by one's adversary." *Nat'l Ass'n*, 844 F.3d at 250. The work-product doctrine "aims primarily to protect the integrity of the adversary trial process itself," by "providing a working attorney with a zone of privacy within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories." *Id.* at 251 (cleaned up). Invoking the doctrine requires "a case-specific determination that a particular document in fact was prepared in anticipation of litigation before applying the privilege to government records." *Id.* "In ascertaining whether a document was prepared in anticipation of litigation," courts apply "a 'because of' test, asking whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* "For that standard to be met, the attorney who created the document must have had a subjective belief that litigation was a real possibility, and that subjective belief must have been "objectively reasonable." *Id.* (internal quotation marks omitted). The Agency properly relied on

the work-product doctrine to withhold records reflecting attorney work-product created in anticipation of litigation. Siehndel Decl. ¶ 81. These materials reflect legal strategy for anticipated litigation over the various Board decisions regarding sovereign immunity in *inter partes* review proceedings. *Id.* Such litigation ultimately materialized, with the United States appearing as amicus curiae. *Id.*; *see also Saint Regis Mohawk Tribe*, 896 F.3d at 1323; *LSI Corp.*, 926 F.3d at 1328.

Releasing this information foreseeably would harm interests that the work-product doctrine protects. Disclosure "would undercut the policy of preserving the effective assistance of [Agency] attorneys employed to help prepare for trial." Siehndel Decl. ¶ 82. "This includes protection of the development and communication of legal theories, opinions, and strategies in advance of adversarial proceedings." *Id.* Disclosure also "would chill the candid communication of legal strategy among counsel and client." *Id.* The Agency thus has met its burden to show foreseeable harm. *See, e.g.*, *Louise Trauma Ctr. LLC v. Dep't of Homeland Sec.*, Civ. A. No. 20-1128 (TNM), 2022 WL 1081097, at *6 (D.D.C. Apr. 11, 2022) ("the context and purpose of attorney work product makes self-evident the harm from its disclosure"); *Seljekaj v. Exec. Off. for U.S. Att'ys*, Civ. A. No. 20-2145 (CRC), 2021 WL 3472437, at *5 (D.D.C. Aug. 6, 2021) (it is "hardly debatable that the government's ability to prosecute [ ] cases would be impeded if its attorneys were deprived of a zone of privacy within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories" (internal quotation marks omitted)).

### D.    The Agency Properly Withheld Exempt Information Under Exemption 6

Finally, the Agency properly relied on Exemption 6 to withhold two forms that Patent Judges submitted to claim production credit for work on particular cases.[5] Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly

---

[5]    The Agency also withheld certain phone numbers, but has conferred with U.S. Inventor and can report that U.S. Inventor does not contest these withholdings.

unwarranted invasion of personal privacy." 5 U.S.C. § 556(b)(6). It thus "protect[s] individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 599 (1982). The production credit that a Patent Judge receives for work on a case impacts her performance rating. Siehndel Decl. ¶ 84. Disclosing this information would reveal how Patent Judges sought to be credited for work product, which the Agency ultimately considered as part of Judges' performance ratings. *Id.* ¶ 85.

These materials fall within Exemption 6's scope. Exemption 6 covers "performance evaluations." *Milner v. Dep't of Navy*, 562 U.S. 562, 570 (2011); *see also Dep't of Air Force v. Rose*, 425 U.S. 352, 377 (1976) ("evaluations of [one's] work performance"). Because the "production credit that a judge gets for work on a particular case . . . impacts the individual judge's performance rating," Siehndel Decl. ¶ 84, "[i]t strains the normal meaning of the word to say that such files are not 'similar' to personnel or medical files," *Wash. Post*, 456 U.S. at 601; *see also Milner*, 562 U.S. at 570 ("the term 'personnel' [is] a modifier meaning 'human resources'").

Releasing these records would cause a clearly unwarranted invasion of personal privacy. "Government employees have at least a minimal privacy interest in" their "job performance evaluation." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1148 (D.C. Cir. 2015) (internal quotation marks omitted). U.S. Inventor identifies no public interest in this information, and it is hard to imagine any. The Patent Judges' privacy interest in these records thus outweighs any minimal public interest in them. *See Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989) ("something, even a modest privacy interest, outweighs nothing every time"); *Chelmowski v. United States*, Civ. A. No. 17-1394 (JEB), 2021 WL 3077558, at *5 (D.D.C. July 21, 2021) (Exemption 6 "is particularly [applicable] here because Chelmowski has not indicated why the public has any interest in obtaining disclosure of the number"); *Pejouhesh v. Postal Serv.*,

Civ. A. No. 17-1684 (RDM), 2019 WL 1359292, at *6 (D.D.C. Mar. 26, 2019) ("[B]alancing is not difficult where, as here, Plaintiff has not provided any explanation regarding the public interest in disclosure, and no such interest is apparent").

Releasing these forms foreseeably would harm interests that Exemption 6 protects. "The very context and purpose of" a record can "make the foreseeability of harm manifest." *Reporters Comm.*, 3 F.4th at 372. "Disclosing these records would violate the expectation of trust and confidentiality that the [Patent Judges have] with their leadership." Siehndel Decl. ¶ 86. The very fact that releasing these records would cause a clearly unwarranted invasion of personal privacy makes the harm of disclosure virtually self-evident. *See, e.g.*, *WP Co. LLC v. SBA*, 575 F. Supp. 3d 114, 121 (D.D.C. 2021) (recognizing that "it is not difficult to note how people would be injured by the release of their" private personnel information, and questioning whether an agency "must demonstrate foreseeable harm for [ ] Exemption 6 withholdings" at all); *Chelmowski*, 2021 WL 3077558, at *5 ("protecting personal information . . . is directly related to Exemption 6's goal"); *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 73 n.1 (D.D.C. 2018) (questioning whether agency must show foreseeable harm under Exemption 6 at all); *Kendrick v. FBI*, Civ. A. No. 20-2900 (TNM), 2022 WL 4534627, at *6 (D.D.C. Sept. 28, 2022) ("fulfilling the terms of exemptions outside Exemption 5 goes a long way to meeting the foreseeable harm requirement" (internal quotation marks omitted)); *S. Env't L. Ctr. v. Council on Env't Quality*, 507 F. Supp. 3d 694, 701, 702 n.4 (W.D. Va. 2020) (agency showed foreseeable harm as to "personal contact information redacted pursuant to FOIA Exemption 6"); *cf. Ball v. U.S. Marshals Serv.*, Civ. A. No. 19-1230 (JEB), 2021 WL 4860590, at *9 (D.D.C. Oct. 19, 2021) ("When Exemption 7(C) is invoked . . . the justifications for non-disclosure generally are also sufficient evidence of foreseeable harm").

### III.   __The Agency Produced All Non-Exempt, Reasonably Segregable Portions of Records__

An agency must take reasonable steps to segregate and release all non-exempt portions of responsive records. 5 U.S.C. §§ 552(a)(8)(A)(ii)(I), 552(b). "Non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 583 (D.C. Cir. 2020) (internal quotation marks omitted). Under FOIA, a segregability analysis "does not call for parsing [a record] line-by-line or segregating material dispersed throughout the document. Instead, the emphasis is on segregation of non-exempt material found in logically divisible sections." *Nat'l Ass'n*, 844 F.3d at 257 (cleaned up).

The Agency reviewed each page and each line of each responsive record to identify reasonably segregable, non-exempt information, and released all such information. Siehndel Decl. ¶ 87. The only portions of these records that the Agency redacted were those that could not be further segregated without disclosing exempt information. *Id.* As such, the Agency has produced all reasonably segregable, non-exempt information. *See Porup v. CIA*, 997 F.3d 1224, 1239 (D.C. Cir. 2021) (agency satisfied segregability duty where it "attested that [it] had conducted a page-by-page and line-by-line review, and released all reasonably segregable, non-exempt information within responsive records," "determining that no additional information may be released without divulging information that falls within the scope of one or more FOIA exemptions" (cleaned up)); *Machado Amadis*, 971 F.3d at 371-72 (agency "appropriately segregated exempt and non-exempt portions  of responsive records where it "conducted a line-by-line review, determined that some non-exempt, factual information within the[ ] records could be segregated for release, and redacted only" exempt information (cleaned up)).

*      *      *

**CONCLUSION**

This Court should enter judgment for the Agency and deny U.S. Inventor's motion.

Dated: April 26, 2023

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar #481052

BRIAN P. HUDAK
Chief, Civil Division

By: /s/ Bradley G. Silverman
BRADLEY G. SILVERMAN
Assistant United States Attorney
DC Bar #1531664
601 D Street NW
Washington, DC 20530
(202) 252-2575
bradley.silverman@usdoj.gov

*Attorneys for the United States of America*